# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PM, INC., an Alaska Corporation,
Plaintiff

    vs.

CAPITAL H GROUP, LLC a Delaware limited liability
company, Defendant

)
)
)
)
)
)
)
)
)
)
)

**JURY DEMANDED**
08cv 4935

08cv4935
JUDGE DOW
MAG. JUDGE COLE

## COMPLAINT

Now comes the Plaintiff, PM, Inc., (PM) an Alaska corporation (formerly known as PeopleMatter, Inc., and sometimes hereafter referred to as PeopleMatter) by its attorneys Grumley, Kamin & Rosic LLC and for its complaint against Capital H Group, LLC, (Capital H) a Delaware limited liability company, states as follows:

### JURISDICTION

1. There is federal jurisdiction over the matter and the parties hereto as the Plaintiff and the Defendant are corporations existing under the laws of different states. The Defendant has an office in Illinois, the Plaintiff has no office in Illinois. The amount in question exceeds seventy-five thousand dollars ($75,000) the jurisdictional threshold for federal court jurisdiction.

### VENUE

2. Venue is properly in the Northern District of Illinois as the contract between the parties which has given rise to this complaint sets Chicago, Illinois as the venue for any disputes between the Parties related to that contract.

### Count 1-Contract

3. PM, Inc. is an Alaska corporation with its principal place of business in Anchorage, Alaska. It is currently out of business. Its name was changed from PeopleMatter, Inc to PM, Inc shortly after its assets were purchased by Capital H Group as hereinafter more fully described.

4. When in business, PM produced and sold "enterprise software" and related services to human resource departments of various large business which permitted those users to efficiently track, compare, quantify and review the performance of its employees and leadership. Its software was used

by some of the largest and most successful companies in the United States, such as Vail Properties, Abbott Laboratories, BP, Alaska Airlines, Skillsoft, Kleinfelder, CCC Information Services, ACS, Bowe Bell & Howell and had pending proposals at firms such as Boeing, Sencorp, Costco, etc. The word "enterprise", in this context, is a proper name for the software.

5. Capital H Group, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. It is in the business of selling services to human resource departments of large businesses and in some regards its business and target market for its products is similar to that of PM when it was in business. The most significant difference between them was that PM provided software and Capital H did not create software for the human resources industry. However, the end users of the goods and services produced by both companies were the same. In fact, PM and Capital H competed for the same customers.

6. PeopleMatter, Inc. was founded in 1999 in Alaska and became successful due to the diligence, creativity and technological focus of its founders. PeopleMatter, when competing for customers against older, larger, more established and better funded competitors in the same field, was frequently successful.

7. When PeopleMatter, Inc was founded few other companies in the human resources business had created software that was user friendly, internet based and had the ability to scale quickly and address the full lifecycle of the human resource segment of the workplace.

8. Capital H is a large and well-financed service provider in the human resources administration industry. It is successful because of its expertise in sales and marketing. Capital H's strength is as a sales organization and not as a developer of software. It sells products and services designed, created and manufactured by others.

9. PeopleMatter, Inc. was founded in 1999 by Anita and David Laurence, both of whom live in Anchorage, Alaska and have held important positions in large organizations. David Laurence's expertise is primarily in engineering and general management. Anita Laurence's expertise is in administration, marketing and product design.

10. All or most of the acts complained of herein occurred in the County of Cook, State of Illinois and the parties have agreed that the venue for any disputes between them is to be Cook County, Illinois.

11. In 2003, a customer of PeopleMatter introduced David and Anita Laurence to an officer of Capital H, Dan Weinfurter CEO. At that time, PeopleMatter correctly perceived the strength of its software product in the marketplace, but knew that in order to get the product before the most senior officers of companies which were potential users it needed the sales and marketing ability it did not

then have. Capital H told Anita and David Laurence that it had a very strong marketing and sales force. The original conversations between the executives of the two companies were to determine if there was a way that the respective independent companies could work together, somewhat like a joint venture, to take advantage of the software developed by PeopleMatter and the sales ability of Capital H.

12. After a number of meetings between principals, Capital H proposed to PeopleMatter for the first time a new proposition that the Parties had not previously discussed: that Capital H would acquire PeopleMatter and/or its assets and that the senior executives of PeopleMatter would become employees of Capital H and continue to develop its products and sell its services as a separate department of Capital H. After lengthy consideration, PeopleMatter agreed in principal to a sale of its business and assets to Capital H. After a prolonged due diligence period, discussion, negotiations and interviews, Capital H purchased the assets of PeopleMatter on September 1, 2006. The purchase terms are set forth in the Asset Purchase Agreement dated, Sept, 2006 and attached hereto as Exhibit 1.

13. The consideration Capital H was to pay for the PeopleMatter's assets and business was divided into three parts: a) PeopleMatter received a modest down payment called the Base Purchase Price of $200,000 and, b) it was to receive an "Earn-Out" over a four year "Earn-Out" period equal to the profits of PeopleMatter standing alone and separate from the other business of Capital H and, c) the executives of PeopleMatter were to receive a bonus if profits met a certain level. See Exhibit 1, Sections 3.3 and 3.4. The principals of PeopleMatter were requested to sign employment agreements that, in effect, restricted their ability to compete against Capital H in the future if they left its employ, lowered their compensation and limited their guaranteed employment period to thirty days.

14. By far the largest component of the purchase price was the "Earn-Out" component which would have paid to PM, Inc, the new name for PeopleMatter, Inc., the profits of the next four years of operation. The "target" of that Earn-Out amount, an amount chosen by Capital H, and agreed to by the Plaintiff, was eight million, seven hundred thousand dollars ($8,700,000). More money could be earned if profits were higher.

15. The $200,000 base payment was paid. No portion of the "Earn-Out" or executive bonus were ever paid.

16. The business and financial payment plan, fully described in the Asset Purchase Agreement,

was to have PeopleMatter or the business that once belonged to PeopleMatter run as a separate business under the direction of the Laurences and their senior management and to account for its profits separately from those of the remainder of Capital H. Then, annually, the profits of PeopleMatter would be calculated and a notice of such calculation would be sent to the Laurences and the "Earn-Out" paid. See Exhibit 1, Sections 3.3 (a) through (g).

17. The business of PeopleMatter, after the sale of its assets to Capital H, had to be managed and sales generated in order to produce profits and to make the "Earn-Out" payments for PeopleMatter. All PeopleMatter, now PM, sales personnel reported to Capital H management.

18. Prior to the execution of the Exhibit 1, the Asset Purchase Agreement, David Laurence was requested by Capital H to prepare a four year hiring plan, which he did. The Plan was completed and approved by Capital H. That Plan required PeopleMatter to hire twenty-six (26) people in the first year and have ninety or more full time employees by the fourth year as business under Capital H's ownership. Shortly after the Purchase Agreement was entered into, David and Anita Laurence were directed to begin the hiring process and they did. A substantial portion of the Laurences' efforts in the initial months after the acquisition was spent hiring new people. These new hires started work between September and December 2006.

19. Again, in January of 2007, Anita and David Laurence were instructed by Capital H to hire an additional six people ( bringing the total to 18) to develop and support the PeopleMatter products, which they did.

20. From September, 2006 to March, 2007, the former executives of PeopleMatter trained the sales force of Capital H on the PeopleMatter software products.

21. In March of 2007, the Capital H CEO, Dan Weinfurter, directed David and Anita Laurence to fire all of their employees and shut down operations. They reluctantly followed that direction. No reason was given for the termination of the business other than as found in the email directing the termination of the business. It is attached hereto as Exhibit 2.

22. PM promptly fired almost all of their employees. A few stayed on to handle servicing of existing PM customers to whom PM had an obligation to support its software. Anita Laurence and one or two employees stayed on until July of that year. In April of 2007, but a few weeks after Capital H closed the PeopleMatter business and the terminated its employees, David Laurence had a severe traumatic brain injury which put him in the hospital for months and eventually led him to rehabilitation, which he still attends.

23. In the six short months that Capital H owned the assets of PeopleMatter, it had fired all of its personnel and lost all of its customers.

24. By the end of March 2007, PeopleMatter, almost all of its employees, its customers and its assets were all gone. PeopleMatter was for all practical reasons "dead" and any opportunity to earn the eight million, seven hundred thousand dollar "target" "Earn-Out" was dead with it. If PeopleMatter achieved greater profits than the target it could have earned even more during the four year "Earn-Out" phase.

25. Notwithstanding Capital H's termination of the PeopleMatter business and the firing of its employees, it held David Laurence, who spent months in the hospital, Anita Laurence and others to their employment agreements with Capital H and thusly restricted their ability to find new jobs.

26. After Capital H closed PeopleMatter and fired its employees, David and Anita Laurence offered to purchase PeopleMatter back from Capital H so that their many years of hard work and huge investment in time and money would not be lost. Their request was refused as Capital H demanded a price that was so high it was economically impossible to reacquire the PeopleMatter assets that were sold.

27. The Defendant's termination of all of the employees of PeopleMatter and closing of the business was a breach of the Asset Purchase Agreement.

28. The Asset Purchase Agreement states:

Section 3.5 Post Closing Operations. During the Earn-Out Period:

(a) The Buyer shall operate the PeopleMatter Division as a stand alone division of the Buyer, and such division shall serve as the Buyer's national enterprise talent management systems platform.

(b) The PeopleMatter Division will be a stand alone P & L including separate business and financial plans (all presented on a GAAP accrual basis).

(c) The PeopleMatter Division will be charged a fixed annual share of the Shared Services and Corporate Expenses based on four percent (4%) of the PeopleMatter Division's annual total costs.

(d) PeopleMatter Division will be charged the standard Commissions payable to the Buyers Client Relationship Managers on all revenues generated by the PeopleMatter Division.

29. The Asset Purchase Agreement clearly divided the time after the acquisition of the PeopleMatter assets into two parts: one part was the "Earn-Out Period" and the other was what remained.

30. The Asset Purchase Agreement requires, in Section 3.5 thereof, that for the four year period of time, the "Earn-Out Period", that the PeopleMatter Division be active and in business.

31. The closing of the PeopleMatter Division by Capital H deprives PM, Inc. of the opportunity to earn during the "Earn-Out" Period the Earn-Out amount, targeted at eight million, seven hundred thousand dollars ($8,700,000). PM, Inc could earn more than the Earn-Out target amount if the profits exceeded the eight million, seven hundred thousand dollar amount.

32. Since March, 2007 Capital H has not sold a PeopleMatter product and the PeopleMatter Division has not operated. Without sales of its products, PeopleMatter cannot achieve any Earn-Out payments and hence it is deprived of the benefit of its bargain with Capital H. With most of the money for its sale of its business assets coming from the "Earn-Out", a cessation of PeopleMatter's business prevents it from receiving any funds it was promised for its assets, customers and business opportunities.

Wherefore, The Plaintiff requests this honorable Court to enter judgment in its favor and against the Defendant for eight million, seven hundred thousand dollars ($8,700,000) or such other greater amount as the evidence may prove and such other relief as may be just and appropriate.

## Count 2-

## Breach of Implied Warranty of Good Faith and Fair Dealing

33. The Plaintiff realleges herein as paragraph 33 of its complaint against the Defendant, paragraphs one through thirty-two of Count 1.

34. In the transaction to sell the assets of PeopleMatter and dealings with Capital H, the Defendant, Capital H had made an implied warranty of good faith and fair dealing which, in instant sale, requires that Capital H not terminate the business of PeopleMatter and deprive PM, Inc of its bargained for opportunity to get paid for the sale of its assets to Capital H.

35. Defendant Capital H breached its implied warranty of good faith and fair dealing by shutting down the business of PeopleMatter, and firing the employees and abandoning the customers of PeopleMatter to whom it owed various ongoing obligations, including support for the PeopleMatter software.

36. Capital H knew or should have known that the Agreement it drafted for the purchase of PeopleMatter's assets required it to keep the PeopleMatter Division open and doing business so that PM could be paid the Earn-Out consideration for the sale of its assets, customers and opportunity.

37. Capital H intentionally and without regard to PM, Inc ignored its warranty of good faith and fair dealing to PM, Inc when it fired all of the employees of the PeopleMatter Division, shut the business down and abandoned the customers of PeopleMatter. Attached as Exhibit 2 hereto is the memo prepared by the Defendant and sent to People Matter terminating the business.

38. Capital H's breach of its implied warranties of good faith and fair dealing damaged PM, Inc in the amount of eight million, seven hundred thousand dollars ( $8,700,000), the targeted Earn-Out amount or such other amount as the evidence may prove.

Wherefore, the Plaintiff requests that this honorable Court enter judgment in favor of the Plaintiff and against the Defendant for its breach of its warranty of good faith and fair dealing in the amount of eight million, seven hundred thousand dollars ($8,700,000) or such other greater amount as the evidence may prove and for such other relief as may me just and necessary.

Respectfully submitted on behalf of PM, Inc

George L. Grumley

George L. Grumley
Grumley, Kamin & Rosic LLC
Three First National Plaza
70 W. Madison St. Suite 2100
Chicago, IL. 60602
312 994-0540

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

### CAPITAL H GROUP, LLC,

### PEOPLEMATTER, INC.,

### THE SHAREHOLDERS OF PEOPLEMATTER, INC.

### AND

### CONVERTIBLE NOTE HOLDERS

### DATED AS OF SEPTEMBER 1, 2006



# TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF THE ASSETS ...........................................................1
    Section 1.1    Assets ...........................................................................................1
    Section 1.2    Excluded Assets ............................................................................3
    Section 1.3    Limited Assumption of Liabilities ................................................3

ARTICLE II CONSIDERATION AND MANNER OF PAYMENT ...........................................3
    Section 2.1    Purchase Price................................................................................3
    Section 2.2    Payment of Purchase Price............................................................4
    Section 2.3    Purchase Price Allocation ..............................................................4
    Section 2.4    Non-Competition ...........................................................................4

ARTICLE III SETTLEMENT AGREEMENT, NOTE HOLDER EARN-OUT
              PAYMENT, SHAREHOLDER EARN-OUT PAYMENT AND
              MANAGEMENT BONUS POOL...........................................................4
    Section 3.1    Appointment of Representative .....................................................4
    Section 3.2    Settlement Agreement and Release ...............................................4
    Section 3.3    Earn-Out.........................................................................................5
    Section 3.4    Management Bonus Pool ................................................................7
    Section 3.5    Post-Closing Operations ................................................................7

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLING PARTIES ...............8
    Section 4.1    Organization; Good Standing ........................................................8
    Section 4.2    Authorization .................................................................................8
    Section 4.3    Consents and Approvals ................................................................8
    Section 4.4    No Violation...................................................................................8
    Section 4.5    Subsidiary .....................................................................................9
    Section 4.6    Capital Stock; Options ...................................................................9
    Section 4.7    Financial Statements and Financial Data.......................................9
    Section 4.8    Absence of Undisclosed Liabilities ...............................................10
    Section 4.9    Absence of Changes or Events ......................................................10
    Section 4.10   Assets ...........................................................................................11
    Section 4.11   Proprietary Rights. ........................................................................11
    Section 4.12   Contracts .......................................................................................14
    Section 4.13   Litigation.......................................................................................14
    Section 4.14   Compliance with Applicable Laws................................................14
    Section 4.15   Licenses and Permits.....................................................................14
    Section 4.16   Taxes.............................................................................................14
    Section 4.17   Transactions With Affiliates .........................................................15
    Section 4.18   Warranties .....................................................................................16
    Section 4.19   Customers and Vendors. ................................................................16
    Section 4.20   Indebtedness..................................................................................16
    Section 4.21   Salaries..........................................................................................16
    Section 4.22   Personnel Agreements ...................................................................16

i

Section 4.23   Brokers or Finders..................................................................16
Section 4.24   Disclosure ...........................................................................16

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER.................................17
Section 5.1    Buyer Organization.................................................................17
Section 5.2    Authorization .......................................................................17
Section 5.3    Consents and Approvals ............................................................17
Section 5.4    No Violation.........................................................................17
Section 5.5    No Brokers or Finders..............................................................18
Section 5.6    No Representation, Warranty or Statement ...........................................18

ARTICLE VI CONDITIONS PRECEDENT TO THE CLOSING ............................................18
Section 6.1    Closing ..............................................................................18
Section 6.2    Deliveries by Selling Parties......................................................18
Section 6.3    Deliveries by Buyer .................................................................19

ARTICLE VII COVENANTS AND OTHER AGREEMENTS ................................................20
Section 7.1    Employee Matters ....................................................................20
Section 7.2    Name Change..........................................................................20
Section 7.3    Indemnification by the Selling Parties; Set-Off.....................................20
Section 7.4    Indemnification by the Buyer .......................................................21
Section 7.5    Further Assistance...................................................................21
Section 7.6    Computation of Tax Liabilities......................................................21

ARTICLE VIII MISCELLANEOUS .................................................................22
Section 8.1    Notices .............................................................................22
Section 8.2    General Definitions..................................................................22
Section 8.3    Entire Agreement; Amendment ........................................................29
Section 8.4    Counterparts; Deliveries ...........................................................29
Section 8.5    Third Parties .......................................................................30
Section 8.6    Expenses ............................................................................30
Section 8.7    Waiver...............................................................................30
Section 8.8    Governing Law .......................................................................30
Section 8.9    Assignments..........................................................................30
Section 8.10   Headings ............................................................................30
Section 8.11   Jurisdiction of Courts..............................................................31
Section 8.12   Waiver of Jury Trial................................................................31
Section 8.13   Construction.........................................................................31
Section 8.14   Seller's Knowledge..................................................................31
Section 8.15   Waiver of Bulk Sales Laws...........................................................31
Section 8.16   Public Announcements ...............................................................31
Section 8.17   Interpretive Matters................................................................31
Section 8.18   Schedule Disclosures................................................................32

## GLOSSARY OF DEFINED TERMS

Page

Accountants.................................................................................................................6

Accounts Receivable....................................................................................................2

Adverse Consequences ..............................................................................................23

Affiliate .....................................................................................................................23

Affiliate Transaction .................................................................................................23

Affiliated Group.........................................................................................................23

Agreement....................................................................................................................1

Allocation Schedule .....................................................................................................5

Anita............................................................................................................................1

Annual Financial Statements ......................................................................................9

Assets ...........................................................................................................................1

Assumed Contracts .....................................................................................................2

Assumed Liabilities .....................................................................................................3

Base Purchase Price ....................................................................................................3

Bill of Sale, Assignment and Assumption Agreement ..............................................18

Bonus Pool Amount...................................................................................................24

Business ......................................................................................................................1

Business Records ........................................................................................................2

Buyer...........................................................................................................................1

Closing ......................................................................................................................18

Closing Date...............................................................................................................18

Code ..........................................................................................................................24

Commercial Software ................................................................................................24

Computer System.......................................................................................................13

Contracts ...................................................................................................................14

Convertible Promissory Note Purchase Agreements.................................................24

Convertible Promissory Notes ...................................................................................24

Customer ...................................................................................................................16

David............................................................................................................................1

Direct Costs.................................................................................................24

Earn-Out Cap ...............................................................................................24

Earn-Out EBITDA........................................................................................24

Earn-Out Payment.........................................................................................25

Earn-Out Percentage .....................................................................................25

Earn-Out Period ...........................................................................................25

Earn-Out Protest Notice ..................................................................................6

Earn-Out Statement........................................................................................6

Earn-Out Year...............................................................................................25

EBITDA.......................................................................................................25

Effective Time ..............................................................................................18

Embedded Software .......................................................................................25

Employment and Non-Competition Agreements...................................................19

Excluded Assets..............................................................................................3

Excluded Cash ..............................................................................................25

Excluded Liabilities .........................................................................................3

Expenses .....................................................................................................30

Financial Statements .......................................................................................9

GAAP..........................................................................................................25

Governmental Authority ................................................................................25

Indebtedness................................................................................................26

Intellectual Property......................................................................................26

Interim Financial Statements ............................................................................9

Investors........................................................................................................1

Liens...........................................................................................................27

Management Bonus Plan ..................................................................................7

Note Holder Earn-Out Payment.......................................................................27

Organizational Documents..............................................................................27

Parties...........................................................................................................1

Party .............................................................................................................1

Patents........................................................................................................27

Payables ........................................................................................................9

PeopleMatter Division ...................................................................................27

Permits ...............................................................................................................27

Person.................................................................................................................27

Prepaid Expenses ................................................................................................2

Proceedings.......................................................................................................14

Promissory Note Schedule.................................................................................4

Purchase Price ....................................................................................................3

Representative.....................................................................................................1

Representative Agreement .................................................................................4

Required Consents ..............................................................................................8

Restructuring.......................................................................................................5

Revenue..............................................................................................................28

Seller ....................................................................................................................1

Seller Earn-Out Payment .................................................................................28

Seller Licenses ..................................................................................................12

Seller Party.........................................................................................................23

Seller Products ..................................................................................................13

Seller Proprietary Rights..................................................................................11

Seller Released Parties .......................................................................................5

Seller's Taxes.....................................................................................................28

Selling Parties .....................................................................................................1

Shared Services and Corporate Expenses ........................................................28

Shareholders........................................................................................................1

Software .............................................................................................................28

Tapestry..............................................................................................................28

Tax ......................................................................................................................28

Tax Returns........................................................................................................29

Third Party Licenses ........................................................................................12

Top Vendor ........................................................................................................16

Trademarks ........................................................................................................29

Transaction Documents"....................................................................................3

## EXHIBITS AND SCHEDULES

### EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | List of Investors |
| Exhibit 3.1 | - | Representative Agreement |
| Exhibit 6.2(a) | - | Bill of Sale, Assignment and Assumption Agreement |
| Exhibit 8.2 | - | Tapestry Software |

### SCHEDULES

| | | |
|---|---|---|
| Schedule 1.1(b) | - | Accounts Receivable |
| Schedule 1.1(d) | - | Work-in-Process |
| Schedule 1.1(e) | - | Assumed Contracts |
| Schedule 1.3 | - | Assumed Liabilities |
| Schedule 2.3 | - | Purchase Price Allocations |
| Schedule 3.2 | - | Promissory Note Schedule |
| Schedule 3.3 | - | Allocation Schedule |
| Schedule 4.1 | - | Organization |
| Schedule 4.3 | - | Required Consents |
| Schedule 4.4 | - | No Violation |
| Schedule 4.6 | - | Capital Stock; Options |
| Schedule 4.7(a) | - | Financial Statements |
| Schedule 4.7(b) | - | Seller's Accounts Receivable |
| Schedule 4.7(c) | - | Seller's Payables |
| Schedule 4.8 | - | Absence of Undisclosed Liabilities |
| Schedule 4.9 | - | Absence of Changes or Events |
| Schedule 4.10 | - | Assets |
| Schedule 4.11(b) | - | Seller Proprietary Rights |
| Schedule 4.11(c) | - | Third Party Licenses and Seller Licenses |
| Schedule 4.11(d) | - | Ownership |
| Schedule 4.11(f) | - | Restrictions |
| Schedule 4.11(h) | - | Seller Products |
| Schedule 4.11(i) | - | Warranty Claims |
| Schedule 4.12 | - | Contracts |
| Schedule 4.13 | - | Litigation |
| Schedule 4.15 | - | Licenses and Permits |
| Schedule 4.16 | - | Taxes |
| Schedule 4.17 | - | Transactions with Affiliates |
| Schedule 4.18 | - | Warranties |
| Schedule 4.19(a) | - | Vendors |
| Schedule 4.19(b) | - | Customers |
| Schedule 4.20 | - | Indebtedness |
| Schedule 4.21 | - | Salaries |

Schedule 4.22      -      Personal Arrangements
Schedule 6.2(i)     -      Bank Accounts

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of September 1, 2006, is by and among Capital H Group, LLC., a Delaware limited liability company (the "Buyer"), David B. Laurence ("David"), Anita L. Laurence ("Anita," and together with David, collectively referred to herein as the "Shareholders"), PeopleMatter, Inc., a Delaware corporation (the "Seller", and together with the Shareholders, collectively referred to herein as the "Selling Parties"), David B. Laurence acting solely in his capacity as the representative for the Shareholders and the Investors pursuant to Article III hereof and not in his individual capacity (the "Representative") and each of those Persons listed on Exhibit A attached hereto (collectively, the "Investors") solely with respect to Article III of this Agreement.  Each of the parties named above may be referred to herein as a "Party" and collectively as the "Parties." Certain capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in Section 8.2.

## RECITALS

**WHEREAS**, the Seller is engaged in the business of designing, developing, marketing and selling software technology and services used for managing, measuring and quantifying employee performance information (the "Business"); and

**WHEREAS**, the Buyer desires to purchase certain assets of the Seller and assume certain liabilities of the Seller related to the Business, and the Seller desires to sell and assign such assets and liabilities to the Buyer; and

**WHEREAS**, the Shareholders collectively own all of the issued and outstanding capital stock of the Seller, and in light of the benefits they will receive by virtue of the transactions contemplated by this Agreement, they will be joining in the representations, warranties and other agreements and covenants of the Seller; and

**WHEREAS**, prior to the date hereof, the Investors provided financing to the Seller and will be entitled to receive certain proceeds from the Seller in connection with the transactions contemplated by this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants of the Parties set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE ASSETS

**Section 1.1**  Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller agrees to sell, transfer, assign and deliver to the Buyer, free and clear of all Liens, and the Buyer agrees to purchase and assume from the Seller, all of the Seller's right, title and interest in and to the following assets used or held in connection with the Business (collectively, the "Assets"):

(a)    Cash.  All cash and cash equivalents of the Seller (other than Excluded Cash);

(b)    Accounts Receivable.  All accounts receivable, notes or other evidences of indebtedness of any Person held by the Seller arising out of the conduct of the Business, including those listed on Schedule 1.1(b) (the "Accounts Receivable");

(c)    Inventories and Supplies.  All inventory, including, without limitation, raw materials, finished goods, product packaging, merchandise for resale and office, operating and other supplies;

(d)    Work-in-Process.  All work-in-process, whether or not accounted for on or reflected upon the books of the Seller described on Schedule 1.1(d);

(e)    Assumed Contracts.  All rights the Seller or the Business has or may have under the contracts, agreements, commitments and understandings listed on Schedule 1.1(e) (the "Assumed Contracts");

(f)    Deposits and Prepaid Expenses.  All deposits and other prepaid assets and expenses of the Seller relating to the Business (the "Prepaid Expenses");

(g)    Seller Proprietary Rights.  All Intellectual Property owned or used by the Seller in connection with the Business including all goodwill associated therewith;

(h)    Name and Goodwill.  The name "PeopleMatter," together with any and all goodwill associated therewith and with the Business;

(i)    Customer Information.  All customer accounts, customer lists, business prospects, advertiser lists, supplier lists, sponsorship lists, files, programs, plans, data and related information, in whatever form;

(j)    Books and Records.  All books and records of the Seller related to the conduct of the Business including, without limitation, all payroll records, computer records, operating systems, computer programs, contracts, agreements, operating manuals, schedules of assets, correspondence, books of account, files, papers, books and all other public and confidential business records or information databases (collectively, the "Business Records"), whether the Business Records are in hard copy form or are electronically or magnetically stored;

(k)    Licenses, Permits and Approvals.  All rights of the Seller in connection with permits, licenses, approvals and authorizations by or of Governmental Authorities;

(l)    Tangible Personal Property.  All furniture, fixtures, computer systems (hardware and software), office equipment, supplies and other tangible personal property of the Seller relating to the Business;

(m)    <u>Telephone Numbers</u>.  All right, title and interest of the Seller in, to and under all telephone numbers used in connection with the conduct of the Business and the operation of the Business, including all extensions thereto; and

(n)    <u>Claims</u>.  Except with respect to Taxes, all claims, refunds, credits, causes of action, rights of recovery and rights of set-off of any kind (other than those related solely to the Excluded Assets or the Excluded Liabilities) of the Seller relating to the Assets and the Assumed Liabilities, whether arising from periods prior to or on or after the Closing.

**Section 1.2**    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained herein, the Seller shall not contribute, convey, assign, or transfer to the Buyer, and the Buyer shall not acquire, any assets (the "<u>Excluded Assets</u>") other than those specifically set forth in <u>Section 1.1</u>.

**Section 1.3**    <u>Limited Assumption of Liabilities</u>.  Notwithstanding anything to the contrary contained in this Agreement or any agreement, document, certificate, or instrument being delivered pursuant to this Agreement or in connection with the transactions contemplated hereby (collectively, the "<u>Transaction Documents</u>"), and regardless of whether any specific liability is disclosed in this Agreement, or in any Transaction Documents or in any Schedule or Exhibit hereto or thereto, except for the assumption of the Assumed Liabilities, the Buyer will not assume, undertake, accept or be bound by or responsible for any debts, liabilities or obligations of the Business or the Seller, of any kind or nature, whether fixed or unfixed, accrued, absolute, contingent, direct, indirect, perfected, inchoate, unliquidated, known or unknown, secured or unsecured, including, without limitation, any liabilities whatsoever relating, directly or indirectly, to (a) any liabilities or obligations with respect to any Employee Benefit Plan or Taxes, (b) any liabilities or obligations of the Seller to the Investors and/or the Shareholders, (c) any litigation involving the Seller, or (d) any debts, liabilities or obligations of the Seller related to or arising out of or in connection with the Seller's ownership, use or operation of any of the Assets or the conduct of the Business on or prior to the Closing; all such liabilities not being specifically assumed by the Buyer are defined herein as "<u>Excluded Liabilities</u>" After the Closing Date, the Buyer shall assume and thereafter pay and fully satisfy when due, only those liabilities and obligations specifically identified on <u>Schedule 1.3</u>, only to the extent that the existence of such liabilities or obligations is not contrary to any covenant, representation or warranty of the Selling Parties under this Agreement (all such liabilities and obligations to be so assumed by the Buyer being referred to herein as the "<u>Assumed Liabilities</u>").

## ARTICLE II
## CONSIDERATION AND MANNER OF PAYMENT

**Section 2.1**    <u>Purchase Price</u>.  The aggregate purchase price for the Assets (the "<u>Purchase Price</u>") shall be (i) Two Hundred Thousand Dollars ($200,000) (the "<u>Base Purchase Price</u>"), plus (ii) the amount of the Assumed Liabilities, plus (iii) the Earn-Out Payment, if any.

**Section 2.2**    Payment of Purchase Price.  Upon the terms and subject to the conditions of this Agreement, at the Closing the Buyer shall pay the Base Purchase Price by wire transfer of immediately available funds to an account(s) designated by the Seller in writing.

**Section 2.3**    Purchase Price Allocation.  The Purchase Price shall be allocated for tax purposes among the Assets in accordance with the methodology set forth on Schedule 2.3.  The Buyer and the Selling Parties (a) agree to be bound, and to cause their respective Affiliates to be bound, by such methodology, (b) shall act, and cause their respective Affiliates to act, in accordance with such allocation in the preparation, filing and audit of any tax return and for all other tax and accounting purposes, and (c) shall not take any position or action inconsistent with such methodology.

**Section 2.4**    Non-Competition.  To ensure to the Buyer the full benefits of the Assets and the Business, and to induce the Buyer to consummate the transactions contemplated herein, each Shareholder has executed an Employment and Non-Competition Agreement (as hereinafter defined).  The Parties agree that the Purchase Price and the agreements of the Buyer hereunder are additional consideration for the non-competition set forth in the Employment and Non-Competition Agreement executed by each of the Shareholders.

**ARTICLE III**
**SETTLEMENT AGREEMENT, NOTE HOLDER EARN-OUT PAYMENT,**
**SHAREHOLDER EARN-OUT PAYMENT AND MANAGEMENT BONUS POOL**

**Section 3.1**    Appointment of Representative.  By execution hereof, and by virtue of and pursuant to the terms of the Representative Agreement, dated as of the date hereof, by and among the Representative, the Shareholders and the Investors (the "Representative Agreement"), a copy of which is attached hereto as Exhibit 3.1, the Representative, shall at and following the Closing, act, and shall have authority to act, for the Shareholders and the Investors and on the Shareholders' and the Investors' behalf in all matters contemplated by, or connected with, Article III of this Agreement, with the same force and effect as the Shareholders and the Investors might act in person. The Buyer shall be entitled to rely on the full power and authority of the Representative to act hereunder on behalf of the Shareholders and the Investors.  If any Representative dies, becomes unable to perform his, her or its responsibilities hereunder or under the Representative Agreement or resigns from such position, a successor to such Representative shall be chosen in accordance with the Representative Agreement.

**Section 3.2**    Settlement Agreement and Release.

(a)    Prior to the date hereof, each of the Shareholders and the Investors provided financing to the Seller, and in connection therewith, the Seller executed Convertible Promissory Notes for the benefit of each Shareholder and Investor as set forth on Schedule 3.2 (the "Promissory Note Schedule").  In connection with the transactions contemplated by this Agreement, the Seller, the Shareholders and the Investors have agreed, subject to the terms and conditions of Article III of this Agreement, to restructure the Seller's debt obligations under the Convertible Promissory

Note Purchase Agreements and the Convertible Promissory Notes listed on the Promissory Note Schedule (the "Restructuring"). In connection with such Restructuring, at the Closing, each Shareholder and Investor shall convey, assign, transfer and deliver to the Seller the original Convertible Promissory Notes free and clear of any Liens, and in exchange therefore, the Shareholders and the Investors shall have the right to receive from the Seller their portion of the Note Holder Earn-Out Payment as set forth on the Allocation Schedule (as defined below). Effective immediately after the Closing, and without further action or consent by any party, (i) the Convertible Promissory Notes are cancelled and have no further force or effect, and (ii) the Convertible Promissory Note Purchase Agreements together will all of the parties' rights, liabilities, obligations thereunder are terminated, and the Convertible Promissory Note Purchase Agreements shall have no further force or effect. The Restructuring shall be deemed to be effective immediately after the Closing.

(b)    For good and valuable consideration, each Shareholder and Investor hereby releases and forever discharges the Seller and its Affiliates, officers, directors, agents, employees, predecessors, shareholders, successors and assigns (collectively, the "Seller Released Parties") from any and all causes of action, claims, suits, claims for sums of money, contracts, controversies, agreements, damages, judgments, disputes, demands, cost and expenses (including attorneys' fees) whatsoever arising out of, relating to or otherwise involving the Convertible Promissory Notes or Convertible Promissory Note Purchase Agreements. In consideration of the payments to be made by the Seller to the Shareholders and the Investors pursuant to Section 3.3, each of the Shareholders and the Investors hereby acknowledges and agrees that each of the Convertible Promissory Notes and Convertible Promissory Note Purchase Agreements, and all of the rights, liabilities and obligations of the parties thereunder, have been fully satisfied and are hereby cancelled, terminated, forever discharged and are no longer in force or effect.

**Section 3.3**    Earn-Out.

(a)    Note Holder Earn-Out Payment.  Subject to the terms of the Employment Agreements, the Buyer shall on the later to occur of (i) one hundred and twenty (120) days after the end of each Earn-Out Year, or (ii) final determination of the Earn-Out Statement for such Earn-Out Year pursuant to this Section 3.3, pay to the Seller (or the Representative, on behalf of the Seller) for payment to the Shareholders and the Investors an aggregate amount in cash equal to the Note Holder Earn-Out Payment for such Earn-Out Year.  Subject to the terms of the Employment Agreements, the Note Holder Earn-Out Payment for any Earn-Out Year shall be distributed to the Shareholders and the Investors in accordance with the allocation schedule attached hereto as Schedule 3.3 (the "Allocation Schedule").

(b)    Seller Earn-Out Payment.  Subject to the terms of the Employment Agreements, the Buyer shall on the later to occur of (i) one hundred and twenty (120) days after the end of the Earn-Out Year, or (ii) final determination of the Earn-Out Statement for such Earn-Out Year pursuant to this Section 3.3, pay to the Seller (or the Representative, on behalf of the Seller) for payment to the Shareholders an aggregate amount in cash equal to the Seller Earn-Out Payment for such Earn-Out Year, and the

Seller Earn-Out Payment for any Earn-Out Year shall be distributed to the Shareholders in accordance with the Allocation Schedule.

(c)     Calculation of Note Holder Earn-Out Payment and Seller Earn-Out Payment. As soon as reasonably practicable, but not later than ninety (90) days after the expiration of the applicable Earn-Out Year, the Buyer will prepare and deliver, or cause to be prepared and delivered, to the Representative a report setting forth the determination of (i) the Earn-Out EBITDA for such Earn-Out Year, (ii) the aggregate Earn-Out Payment for such Earn-Out Year, (iii) the Note Holder Earn-Out Payment for such Earn-Out Year, and (iv)  the Seller Earn-Out Payment for such Earn-Out Year (the "Earn-Out Statement").

(d)     Earn-Out Protest Notice. Within thirty (30) days of the Buyer's delivery of the Earn-Out Statement for any Earn-Out Year, the Representative may deliver, on behalf of the Shareholders and the Investors, written notice (the "Earn-Out Protest Notice") to the Buyer of any objections, specifying any contested items and the basis therefor, which the Representative may have to such Earn-Out Statement. The failure of the Representative to deliver such Protest Notice within the prescribed time period will constitute the Shareholders and the Investors acceptance of such Earn-Out Statement as determined by the Buyer. Upon receipt of the Earn-Out Statement, the Representative and its accountants will be given reasonable access to the Buyer's relevant books, records, workpapers and personnel during reasonable business hours for the purpose of verifying the Earn-Out Statement.

(e)     Resolution of the Seller's Protest. If the Buyer and the Representative are unable to resolve any disagreement with respect to the Earn-Out Statement within thirty (30) business days following the Buyer's receipt of the Earn-Out Protest Notice, then at the request of the Buyer or the Representative the items in dispute will be referred to a firm of independent public accountants as to which the Representative and the Buyer mutually agree (the "Accountants") for final determination within forty-five (45) calendar days. The determination by the Accountants shall be based solely on presentations by the Buyer, on the one hand, and the Representative, on the other hand, and shall not involve independent review. In resolving any disputed item, the Accountants may not assign a value to any particular item greater than the greatest value for such item claimed by either party or less than the lowest value for such item claimed by either party, in each case as presented to the Accountants. The fees and expenses of the Accountants shall be borne by the Shareholders and the Investors, on the one hand, and the Buyer, on the other hand, based upon the percentage that the amount not awarded to the Buyer or the Shareholders and the Investors bears to the amount actually contested by such party.

(f)     Payment of Note Holder Earn-Out Payment and Seller Earn-Out Payment. Within ten (10) business days of the final determination of the Earn-Out Statement pursuant to this Section 3.3, the Buyer shall pay to the Seller (or the Representative, on behalf of the Seller) for distribution by the Representative to the Shareholders and the Investors in accordance with the percentages set forth on the Allocation Schedule each of the Note Holder Earn-Out Payment and the Seller Earn-Out Payment by wire transfer of

immediately available funds to the account(s) as designated in writing by the Representative.

(g)     Limitations.  If the Earn-Out EBITDA for any Earn-Out Year is less than zero, no Earn-Out Payment shall be due for such Earn-Out Year, but such have no effect on the Earn-Out EBITDA with respect to any other Earn-Out Year.  Notwithstanding anything to the contrary contained herein, in no event will the Earn-Out Payment for any Earn-Out Year exceed the applicable Earn-Out Cap for such year.

**Section 3.4**     Management Bonus Pool.  Immediately after the Closing, the Buyer shall establish a key employee bonus plan  for director level new hires (the "Management Bonus Plan") on terms  to be determined and approved by the Buyer's board of managers, which Management Bonus Plan shall be designed to reward those key employees of the PeopleMatter Division (other than the Shareholders) who meet and exceed their established performance objectives.  During the Earn-Out Period, the Buyer shall allocate the Bonus Pool Amount as determined for each Earn-Out Year to the Management Bonus Plan for payment to the participants in accordance with the terms set forth in the Management Bonus Plan.

**Section 3.5**     Post-Closing Operations.  During the Earn-Out Period:

(a)     The Buyer shall operate the PeopleMatter Division as a stand alone division of the Buyer, and such division shall serve as the Buyer's national enterprise talent management systems platform.

(b)     The PeopleMatter Division will be a stand alone P&L including separate business and financial plans (all presented on a GAAP accrual basis).

(c)     The PeopleMatter Division will be charged a fixed annual share of the Shared Services and Corporate Expenses based on four percent (4%) of the PeopleMatter Division's annual total costs.

(d)     The PeopleMatter Division will be charged the standard commissions payable to the Buyer's Client Relationship Managers on all revenues generated by the PeopleMatter Division.

The Parties acknowledge that (i) no express or implied assurances are given that any Earn-Out Payment will be payable, (ii) it is possible that no Earn-Out Payment will be payable depending on the results of the PeopleMatter Division, and (iii) except for the covenants in this Section 3.5, no covenants, representations, or warranties, express or implied, are made by the Buyer with respect to the future  operations, results of operation, financial or other condition or prospects of the PeopleMatter Division.

7

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLING PARTIES

Each of the Selling Parties hereby jointly and severally represent and warrant to the Buyer that:

**Section 4.1**　　Organization; Good Standing.　The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted.　The Seller is duly qualified or otherwise authorized as a foreign entity to transact business in each jurisdiction listed on Schedule 4.1, which are all of the jurisdictions in which the nature of the Business or the location of the Assets requires the Seller to so qualify.

**Section 4.2**　　Authorization.　Each of the Selling Parties has all requisite power and authority to execute, deliver and perform their respective obligations under this Agreement and each Transaction Document to which they are a party.　The execution and delivery of this Agreement and the Transaction Documents to which the Seller is a party, the performance of its obligations hereunder and thereunder and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite action in accordance with applicable Law, and no other proceeding on the part of the Seller is necessary.　This Agreement and the Transaction Documents to which each of the Selling Parties is a party have been duly executed and delivered by each of the Selling Parties, as applicable, and constitute the legal, valid and binding obligation of each of the Selling Parties, as applicable, enforceable against them in accordance with their respective terms.

**Section 4.3**　　Consents and Approvals.　Except as set forth in Schedule 4.3 (the "Required Consents"), no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained in connection with the authorization, execution, delivery and performance by the Selling Parties of this Agreement and the Transaction Documents, or the consummation of the transactions contemplated hereby and thereby.

**Section 4.4**　　No Violation.　Except as set forth on Schedule 4.4, the execution, delivery and performance by the Selling Parties of this Agreement and the Transaction Documents and the consummation of the transactions contemplated herein and therein will not:　(a) result in the breach of any of the terms or conditions of, or constitute a default under, or in any manner release any party thereto from any obligation under, any mortgage, note, bond, indenture, contract, agreement, license or other instrument or obligation of any kind or nature by which any of them may be bound or affected; (b) violate or conflict with any law, order, permit, writ, injunction, judgment, rule, regulation, statute, decree or other decision of any court, administrative agency, or Governmental Authority; (c) violate any provision of the Organizational Documents of the Seller; or (d) result in the creation or imposition of any Lien upon any Asset.

**Section 4.5**    Subsidiary. The Seller has no subsidiaries and does not own, directly or indirectly, any stock, partnership interest, joint venture interest or other equity interest in any other corporation, trust, partnership, joint venture or other entity.

**Section 4.6**    Capital Stock; Options. Schedule 4.6 sets forth the entire authorized capital stock and the total number of issued and outstanding shares of the capital stock of the Seller. All of the outstanding shares of capital stock of the Seller are validly issued, fully paid and non-assessable and owned beneficially and of record, by the Shareholders in the classes, amounts and percentages set forth on Schedule 4.6. Except as set forth on Schedule 4.6, there are no outstanding options, warrants, rights, calls, commitments, conversion rights, rights of exchange, plans or other arrangements or claims of any character providing for the purchase, issuance or sale of any share of the capital stock of the Seller.

**Section 4.7**    Financial Statements and Financial Data.

(a)    Schedule 4.7(a) contains true and complete copies of (i) the unaudited balance sheet and statement of income for the fiscal years ended December 31, 2004 and December 31, 2005 (collectively, the "Annual Financial Statements"), and (ii) the unaudited balance sheet and statement of income for the seven month (7) month period ended, July 31, 2006 (collectively, the "Interim Financial Statements"). The Annual Financial Statements and the Interim Financial Statements are herein sometimes referred to as the "Financial Statements". Except as set forth in Schedule 4.7(a), each of the Financial Statements has been prepared in accordance with the books and records of the Seller, which are true and correct in all material respects. Each of the Financial Statements is true and correct in all material respects and fairly presents the Seller's financial position, assets and liabilities and results of operations as of the dates thereof and for the periods covered thereby in each case in accordance with GAAP consistently applied among the periods which are the subject of the Financial Statements, except in the case of the Interim Financial Statements for the absence of footnote disclosure and year-end adjustments (none of which are or will be inconsistent with past practice or material, individually or in the aggregate).

(b)    Schedule 4.7(b) sets forth a complete and accurate list of the Seller's Accounts Receivable as of the date hereof and, such list shows the aging of the Seller's Accounts Receivable. All Accounts Receivable (a) have arisen in bona fide arm's-length transactions in the ordinary course of business, (b) are valid and binding obligations of the account debtors and have arisen in the ordinary course of business, (c) are not subject to any counterclaim or set-off, and (d) are collectable in the ordinary course of business.

(c)    Payables. Schedule 4.7(c) sets forth a complete and accurate list of Seller's accounts payable as of the date hereof (the "Payables"). All Payables have arisen in bona fide arms-length transactions in the ordinary course of business and the Seller has been paying such Payables in the ordinary course consistent with past practice.

(d)    Work-in-Process.    All work-in-progress reflected on the Financial Statements has been performed pursuant to customer order or contract therefore and shall

become accounts receivable in due course, which shall be collectible in the ordinary course of business.

(e)     All projections, budgets or other forward-looking financial information that have been provided or made available to the Buyer or its agents or representatives by or on behalf of the Selling Parties were prepared in good faith and based on assumptions and forecasts that were reasonable as of the date of such information.

**Section 4.8**     Absence of Undisclosed Liabilities.  The Seller does not have any debts, liabilities or obligations of any nature affecting the Business or the Assets (whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, or otherwise, and whether due or to become due) arising out any transaction, series of transactions, action or inaction entered into or occurring on or prior to the date hereof, or any state of facts or condition existing on or prior to the date hereof (regardless of when such liability or obligation is asserted), except (a) as and to the extent clearly and accurately reflected and accrued for or reserved against in the Financial Statements; (b) liabilities and obligations which have arisen in connection with the Business after July 31, 2006 in the ordinary course of business consistent with past custom and practice (none of which results from, arises out of, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of law by the Seller and none of which is, individually or in the aggregate, material); and (c) for liabilities specifically delineated on Schedule 4.8.

**Section 4.9**     Absence of Changes or Events.  Except as set forth on Schedule 4.9, since the December 31, 2005, the Seller has conducted the Business in the ordinary course of business consistent with past practices.  Without limiting the generality of the foregoing, since July 31, 2006, except as disclosed on Schedule 4.9, there has not been:

(a)     one or more events, occurrences, developments or states of circumstances or facts which, individually or in the aggregate, has had, or could reasonably be expected to have, a material adverse effect on business, affairs, prospects, operations, assets, or condition (financial or otherwise) of the Business;

(b)     any collection, attempt to collect or write-off as uncollectible of any notes or accounts receivable or other cash obligations owed to the Seller, other than in the ordinary course of business consistent with past practices;

(c)     any transaction with any officer or employee of the Seller, except in the ordinary course of business consistent with past practice;

(d)     any acquisition or disposition by the Seller of any business or the disposition of a significant amount of assets, whether by merger, purchase or sale of stock, purchase or sale of assets or otherwise;

(e)     any damage, destruction or other casualty loss (whether or not covered by insurance) affecting the Business, the Assets or the Seller;

(f)     any Tax election by the Seller;

(g)     any delay or postponement of any payment of any accounts payable or any other liability or obligation relating to the Business, or any extension or agreement to extend the payment date of any such accounts payable or other liability or obligation relating to the Business, in any case, other than in the ordinary course of business consistent with past practices;

(h)     any change by the Seller in its method of accounting or accounting practice, other than changes required under applicable Law, or any failure by the Seller to maintain its books, accounts and records in the ordinary course of business consistent with past practices; or

(i)     any agreement, understanding or commitment by the Seller to do any of the foregoing.

**Section 4.10**   Assets.  Except as set forth on Schedule 4.10, the Seller owns good title to all of the Assets free and clear of any and all Liens.  The Seller has the right to convey, and upon consummation of the transactions contemplated by this Agreement, the Seller will have conveyed and the Buyer will be vested with, good title to the Assets, free and clear of all Liens. The Assets constitute all of the tangible and intangible assets, properties and rights used in or material to the Business and all of the assets necessary to conduct the Business as presently conducted, as conducted in the previous twelve months and as currently proposed to be conducted.

**Section 4.11**   Proprietary Rights.

(a)     The Seller owns, or is licensed, or otherwise possesses legally enforceable rights, to use, distribute, sell, resell, license or sublicense, as applicable, all Intellectual Property used, distributed, sold, resold, licensed and sublicensed in connection with the business of the Seller, including, without limitation, the Tapestry ("Seller Proprietary Rights").  Each item of Seller Proprietary Rights will, immediately subsequent to the Closing hereunder, continue to be owned and/or available for use, distribution, sale, resale, license or sublicense by the Seller on terms which are identical to those pursuant to which the Seller, immediately prior to the Closing, owns and/or has the right to use, distribute, sell, resell, license or sublicense, as applicable, such item.

(b)     Schedule 4.11(b) contains a complete and correct list of all of the Seller's patents and patent applications; trademarks and service marks, and any registrations and successful applications for registration thereof; domain names; copyright registrations and applications for registration thereof; and material computer software owned or used by the Seller, including all Embedded Software, including, where applicable, the name of the registered owner, date of registration or application and name of registration body where the registration or application was made.  The Seller has delivered to the Buyer correct and complete copies of all such patents, registrations and applications and has made available to the Buyer correct and complete copies of all written documentation relating to the prosecution (if applicable) of each such item.  All renewal and maintenance fees in respect of the items listed in Schedule 4.11(b) (if applicable) have been duly paid.  The Seller has licenses for all Commercial Software used in its business, use of such Commercial Software is in accordance with such licenses and the Seller does not have to pay nor will it be required to pay any on-going license or other fees or other amounts for

11

continued use of such Commercial Software in the manner in which it is currently used or for continued maintenance and/or support.

(c)    Schedule 4.11(c) sets forth a compete list of all licenses, sublicenses and other agreements as to which the Seller is a party and pursuant to which the Seller is engaged or authorized to develop, create, design, use, modify, create derivative works of, distribute, sell, resell, license, sublicense, support, maintain, integrate or implement any Intellectual Property of any third parties (in whole or in part), including, without limitation, any Embedded Software ("Third Party Licenses"). Except as set forth in Schedule 4.11(c), Seller is not obligated to pay any fees, royalties or other compensation or consideration for the continued rights under the Third Party Licenses or for continued maintenance and/or support of software which is the subject thereof. Schedule 4.11(c) sets forth a compete list of all licenses, sublicenses and other agreements as to which the Seller is a party and pursuant to which any third party is engaged or authorized to develop, create, design, use, modify, create derivative works of, distribute, sell, resell, license, sublicense, support, maintain, integrate or implement any of the Seller Proprietary Rights or services (in whole or in part), including any source code escrow agreements ("Seller Licenses"). The Seller has delivered to the Buyer correct and complete copies of all Third Party Licenses and Seller Licenses (as amended to date). The Seller is not in violation of any such Third Party Licenses or Seller Licenses, and the Third Party Licenses and Seller Licenses will continue to be legal, valid, binding, enforceable and in full force and effect following the Closing.

(d)    Except for Commercial Software and other than Intellectual Property which is the subject of Third Party Licenses, (i) the Seller is the sole and exclusive owner of the Seller Proprietary Rights (free and clear of any Liens), (ii) the Seller is not obligated to pay any continuing fees, royalties or other compensation or consideration to any third party with respect to any such owned Seller Proprietary Rights, and (iii) all such owned Seller Proprietary Rights were developed, created and designed by the Seller's employees acting within the scope of their employment or by consultants or contractors pursuant to agreements listed in Schedule 4.11(d). Except as set forth on Schedule 4.11(d), no government funding or university or college facilities were used in the development of the Seller's Products.

(e)    The Seller has not infringed, misappropriated or violated, nor is currently infringing, misappropriating or violating, any Intellectual Property of any third party and there are no claims pending or, to the knowledge of Selling Parties, threatened by any Person alleging any such infringement, misappropriation or violation. To the knowledge of the Selling Parties, there is no unauthorized use, infringement or misappropriation of any of the Seller Proprietary Rights, including by an employee or former employee of the Seller.

(f)    Except as set forth on Schedule 4.11(f), the Seller has not entered into any agreement under which the Seller is restricted, and, to the knowledge of the Selling Parties, the Seller is not otherwise restricted, (i) from selling, licensing or otherwise marketing or distributing any products or services, whether to any class or type of customers or through any type of channel or in any geographic area or during any period of time, or otherwise, including by virtue of any exclusive arrangements with distributors, resellers or others, or (ii) from combining, incorporating, embedding or bundling or allowing others to combine, incorporate, embed or bundle any of the Seller Products with those of another party. The Seller has delivered

to the Buyer correct and complete copies of all agreements listed on Schedule 4.11(d) (as amended to date).

(g)     The Seller has taken all necessary measures to safeguard and maintain all right, title and interest in and to all Seller Proprietary Rights. All officers, employees, consultants and contractors of the Seller who have access to Seller Proprietary Rights have executed and delivered to the Seller an agreement regarding the protection of such Seller Proprietary Rights, and the assignment to or ownership by the Seller of all Intellectual Property arising from the services performed for the Seller by such persons. No current or prior officer, employee or consultant of the Seller claims, and the Seller is not aware of any grounds to assert a claim to, or any ownership interest in, any such Intellectual Property as a result of having been involved in the development, creation or design of such property while employed or engaged by or consulting to the Seller, or otherwise.

(h)     Schedule 4.11(h) contains a complete list of all products or services developed, or in the process of being developed, by or for the Seller for distribution (collectively, the "Seller Products"). There are no material defects in the Seller Products and the Seller Products perform substantially in accordance with related documentation and promotional material supplied by the Seller. The Seller has adequately documented, maintained and organized the materials and information related to, associated with or used or produced in the development of the Seller Products, including source code, internal notes and memos, technical and design documentation, compiler information, drawings, flow charts, diagrams, source language statements, such that a reasonably competent programmer or engineer could understand, use, compile, maintain, support, and modify the Seller Products. The Seller Products do not contain any (i) "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" (as these terms are commonly used in the computer software industry), or other software routines designed to permit unauthorized access, to disable or erase software or data, or to perform any other similar type of functions or (ii) except as set forth in Schedule 4.11(h), open source or public library software (such as, but not limited to, software licensed under the GNU General Public License, BSD License, Apache or Open LDAP Public License).

(i)     Except as set forth on Schedule 4.11(i), the Seller has not made any oral or written representations or warranties with respect to the Seller Products. Schedule 4.11(i) lists all warranty claims (including any pending claims) related to the Seller Products and the nature of such claims. The Seller has delivered to the Buyer complete and accurate records of the Seller with respect to all Seller Product fixes (including fixes currently in process), problem lists, maintenance issues and customer complaints related to the Seller Products.

(j)     The computer software, hardware, systems and databases used internally in the operation of the Business (the "Computer System") adequately meets the data processing needs of the Business and operations of the Seller as presently conducted. The Seller has arranged for back-up data processing services adequate to meet its data processing needs in the event the Computer System or any of its material components is rendered temporarily or permanently inoperative as a result of a natural or other disaster. The Computer System performs substantially in accordance with the documentation related thereto, and the Seller has not suffered any failures, errors or breakdowns in the Computer System within the past twelve (12) months which have caused any substantial disruption or interruption in the Business.

**Section 4.12**   Contracts.   Schedule 4.12 is a true, correct and complete list of all contracts, agreements, licenses, commitments, obligations and understandings, in any case whether written or oral, to which the Seller is party or by which any Asset is bound (collectively, the "Contracts") and all amendments, waivers and other modifications thereof.  The Seller has provided the Buyer with true and correct copies of all Contracts, including all amendments, waivers and other modifications thereof.  The Seller is not in default, nor has any event occurred which with the giving of notice or passage of time or both would constitute a default, under any Contract or any other obligation owed by the Seller thereunder.  To the knowledge of the Selling Parties, no other party to any Contract is in default thereunder nor, to the knowledge of the Selling Parties, has any event occurred which with the giving of notice or the passage of time or both would constitute a default by any other party to any Contract.  Except as set forth on Schedule 4.12, each Contract is in full force and effect, is valid and enforceable against Seller in accordance with its terms and, to the knowledge of the Selling Parties, is not subject to any claims, charges, set-offs or defenses.

**Section 4.13**   Litigation.   Except as set forth on Schedule 4.13, there has been no, and there is currently no, suit, action, proceeding, investigation, grievance, claim or order (collectively, "Proceedings") pending or, to the knowledge of the Selling Parties, threatened against the Selling Parties or any of the current or former officers, directors or employees of the Seller with respect to the Business or the Assets, before any court or Governmental Authority; nor, to the knowledge of the Selling Parties, is there any reasonable basis for any such Proceeding.  None of the Selling Parties or any Affiliate of any of the foregoing (a) is subject to any judgment, order or decree of any court or Governmental Authority; (b) has received any opinion or memorandum or legal advice from legal counsel to the effect that it is exposed from a legal standpoint, to any liability that may be material to its business; or (c) is engaged in any legal action to recover monies due it or for damages sustained by it or to cause a third party to act or refrain from acting in a certain manner.

**Section 4.14**   Compliance with Applicable Laws.   The Seller is, and has been, in compliance with all Laws and requirements in connection with the conduct, ownership, use, occupancy or operation of the Business and the Assets, and none of the Selling Parties has received notice (written or oral) of any violation of any Law or requirement in connection with the conduct, ownership, use, occupancy or operation of the Business or the Assets.

**Section 4.15**   Licenses and Permits.   The Seller holds, and at all times has held, and, as of the Closing, the Buyer will hold or be able to obtain without undue expense or delay, all Permits necessary or desirable for the conduct, ownership, use, occupancy or operation of the Business or the Assets, all of which are identified on Schedule 4.15, and complete and correct copies of which have previously been furnished to the Buyer.  The Seller is and at all times since has been, in compliance with such Permits, all of which are in full force and effect, and the Seller has not received any notices (written or oral) to the contrary.

**Section 4.16**   Taxes.   All Taxes due and payable by the Seller (which, for the purposes of this Section 4.16 shall include the Shareholders with respect to the items determined under Section 1366 of the Code)  have been timely paid in full. The Seller has timely filed all federal, state, county, local and foreign Tax Returns that it is required to have filed, and such returns are

complete and correct in all material respects. Any deficiencies proposed as a result of any audits of the Seller by any Governmental Authority have been paid or settled, and there are no present disputes as to Taxes payable by the Seller. There are no unexpired waivers or extensions of any statute of limitations with respect to any Taxes of the Seller and the Seller is not a party to any action or proceedings by any Governmental Authority for the collection or assessment of Taxes against it. No claim has ever been made by an authority in a jurisdiction where the Seller does not file Tax Returns that the Seller may be subject to taxation by that jurisdiction. Schedule 4.16 sets forth each jurisdiction in which the Seller is required to file Tax Returns or pay Taxes. There are no Liens on any of the Assets that arose in connection with any failure (or alleged failure) to pay any Tax. The Seller has timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed. The Seller does not have any liability for Taxes of another Person under Treasury Regulation Section 1.1502-6, as a transferee or successor, by contract, or otherwise. The Seller is not party to any agreement, contract, arrangement, or plan that has resulted or could result, separately, or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Section 280G of the Code. The Seller is not and has not ever been a member of an Affiliated Group. The Seller is not and has not ever been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code. The aggregate unpaid Taxes of the Seller (i) did not, as of the July 31, 2006, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the balance sheet as of such date included in the Financial Statements and (ii) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Seller in filing its Tax Returns. The Buyer will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) "closing agreement" described in Section 7212 of the Code (or any corresponding or similar provision of state, local or foreign Tax law) executed by the Seller on or prior to the Closing Date, (ii) installment sale or open transaction disposition made by the Seller on or prior to the Closing Date, or (iii) prepaid amount received by the Seller on or prior to the Closing Date. The Seller has not engaged in any reportable transaction within the meaning of Sections 6111 and 6112 of the Code. The Seller has not requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact any tax attribute of or the amount of Tax due from the Buyer after the Closing Date. The Seller has collected and maintained all resale certificates and other documentation required to qualify for any exemption from the collection of sales taxes. The Seller has been an "S corporation" as that term is defined in Section 1361(a)(1) of the Code (and any corresponding provision of state or local law) at all times since inception of the Seller.

**Section 4.17**   Transactions With Affiliates. Except as set forth on Schedule 4.17, since January 1, 2002, the Seller has not engaged in any Affiliate Transactions. From and after the Closing Date, the Buyer shall have no obligation to engage in any Affiliate Transaction and shall not be bound by any contract, agreement, arrangement or commitment with respect to any Affiliate Transaction. Except as set forth on Schedule 4.17, no Affiliate or former Affiliate of Seller has any material interest in any property used in the Business.

**Section 4.18** <u>Warranties.</u>　The Seller has provided to the Buyer true, correct and complete copies of the standard forms of product or service warranties and guaranties provided by the Seller with respect to goods and services sold or provided by the Seller in connection with the Business. Schedule 4.18 sets forth in reasonable detail all deviations from such warranties or guarantees which the Seller has made since January 1, 2002.

**Section 4.19** <u>Customers and Vendors.</u>

(a)　Schedule 4.19(a) is a complete and correct list of the ten (10) largest vendors to the Business (each, a "Top Vendor"), in terms of aggregate dollar value of fees paid to vendors by the Seller during calendar year 2005, including the amount paid by the Seller to each such vendor in calendar year 2005. No Top Vendor has canceled or otherwise terminated or materially and adversely modified its relationship with the Seller. None of the Selling Parties has received any notice, nor does the Selling Parties have knowledge, that any Top Vendor intends to cancel or otherwise terminate or materially and adversely modify its relationship with the Seller on account of the transactions contemplated by this Agreement, the Transaction Documents or otherwise.

(b)　Schedule 4.19(b) is a complete and correct list of current customers of the Business and the customers of the Business during calendar year 2005 (each, a "Customer"), including the amount of sales to each such customer during calendar year 2005 and the first seven (7) months of calendar year 2006. No Customer has canceled or otherwise terminated or materially and adversely modified its relationship with the Seller. None of the Selling Parties has received any notice, nor does the Selling Parties have any knowledge, that any Customer intends to cancel or otherwise terminate or materially and adversely modify its relationship with Seller on account of the transactions contemplated by this Agreement, the Transaction Documents or otherwise.

**Section 4.20** <u>Indebtedness.</u>　Schedule 4.20 is a correct and complete list of the Seller's outstanding Indebtedness as of the date hereof.

**Section 4.21** <u>Salaries.</u>　Schedule 4.21 is a true, complete and correct list setting forth (a) the names, current compensation rate and other compensation of all individuals currently employed by the Seller, and (b) the names and total annual compensation for all independent contractors who render services on a regular basis to the Seller.

**Section 4.22** <u>Personnel Agreements.</u>　Except as set forth on <u>Schedule 4.22</u>, the Seller is not a party to or obligated in connection with the Business with respect to any outstanding contracts with current or former employees, agents, consultants, advisers, salesmen, sales representatives, distributors, sales agents, independent contractors, or dealers.

**Section 4.23** <u>Brokers or Finders.</u>　None of the Selling Parties or any Affiliate of any of the foregoing has retained any broker or finder, or made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**Section 4.24** <u>Disclosure.</u>　No representation, warranty or statement made by the Selling Parties in this Agreement, the Transaction Documents or any of the exhibits or schedules hereto

or thereto, or any agreements, certificates, documents or instruments delivered or to be delivered to the Buyer in accordance with this Agreement or the other Transaction Documents, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading. There is no fact known to the Selling Parties relating to the Assets, the Seller or the Business that could reasonably be expected to have a material adverse effect on the Assets, the Seller, the condition (financial or otherwise) of the Business or the results of operations of the Business that has not been clearly and fully disclosed in this Agreement or the schedules hereto to the Buyer by the Seller.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer hereby represents, warrants and covenants to the Selling Parties that:

**Section 5.1**    Buyer Organization.   The Buyer is a limited liability company duly organized and validly existing under the laws of the State of Delaware. The Buyer has the requisite power and authority to own all of its properties and assets and to conduct its business as now being conducted.

**Section 5.2**    Authorization.   The execution and delivery of this Agreement and the Transaction Documents to which the Buyer is a party, the performance by the Buyer of its obligations hereunder and thereunder and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action in accordance with applicable Law, and no other act or proceeding on the part of the Buyer is necessary. The Buyer has all requisite power and authority to enter into, execute and deliver this Agreement and the Transaction Documents to which the Buyer is a party and to perform its obligations hereunder and thereunder. This Agreement and the Transaction Documents to which the Buyer is a party have been duly executed and delivered by the Buyer and constitute the valid and legally binding obligations of the Buyer, enforceable in accordance with their respective terms.

**Section 5.3**    Consents and Approvals.   No consent, approval or authorization of, or declaration, filing or registration with, or notice to, any Governmental Authority or other Person is required to be made or obtained by Buyer in connection with the Buyer's authorization, execution and delivery of this Agreement or the Transaction Documents to which the Buyer is a party, the performance by the Buyer of its obligations hereunder and thereunder, and the consummation by the Buyer of the transactions contemplated hereby and thereby.

**Section 5.4**    No Violation.   The execution, delivery and performance by the Buyer of this Agreement and the Transaction Documents to which the Buyer is a party and the consummation of the transactions contemplated herein and therein do not and will not: (a) result in the breach of any of the terms or conditions of, or constitute a default under, or in any manner release any party thereto from any obligation under, any mortgage, note, bond, indenture, contract, agreement, license or other instrument or obligation of any kind or nature by which the Buyer may be bound or affected; (b) violate or conflict with   any law, order, permit, writ,

17

DATE \@ "M/d/yyyy" 3/22/2007
PeopleMatter Messages
Core message: assumption is that we sell PM

As you know, we have invested a lot of time and resources into PM. After much deliberation and discussion within the firm among our management team and the MDs, and with Mike, Dave, and Anita, we've come to the conclusion that we need to change our course on PM.

We have determined that software development -- which will be required on an ongoing basis to continue to meet marketplace demand -- is not a core competency of Capital H Group. This is not a reflection on the software engineering and support team at PM who have worked long hours during the last several months to support sales and product initiatives. And, given the direction we are headed with our core offerings, we are not certain it should be. Also, without a dedicated product specific sales force, we have concluded that it will be difficult for us to sell this product in sufficient volume to make commercial sense for us. And we have decided that we do not really want to go down the path of creating a separate, product specific, sales force.

Therefore, in numerous discussions we have had with PM leadership, we're investigating ways to continue to offer the product through an alliance structure of some type, rather than as an owner and developer. The most likely scenario at this time seems to be a spin-out in where we sell the brand and the tool to a 3rd party. A less likely but possible scenario might be to spin the company to the existing management team. We have started investigating multiple options with Anita, Mike, and Dave and hope to have resolution as far as a strategic alternative within the next 30-60 days to share with you.

What are the implications? (1) We will continue to maintain and provide the same high degree of service to existing PM clients as they are used to (2) Until we have a clear solution with regard to a new strategic alternative, we will not proactively pursue new PM clients. (3) We will work closely with the CRMs to appropriately manage prospects already in the pipeline

This does have considerable impact on several members of the PM team we hired to join the firm after we acquired PM and we are talking with all of them individually to see whether and how we can deploy them into new positions within our core business. Most likely, this retrenchment will lead to some layoffs and for that we are truly sorry.

| Audience | Timing | Vehicle | From whom | Variation from Core Message? | Comments |
|---|---|---|---|---|---|
| PeopleMatter Employees who will not be kept on (Anchorage and Seattle based) | Before general employee announce-ment | PM team meeting and then individual meeting or phone call | Dave or Anita or Mike as appropriate | No | Need to communicate their status as employees – last paycheck etc. Need to communicate why some of the PM folks are being kept on |


EXHIBIT
2

| | | | | | |
|---|---|---|---|---|---|
| PeopleMatter Employees who will be kept on | Before general employee announce-ment | PM team meeting and then individual meeting or phone call | Dave or Anita initially; then Office MD and Tara | No | Need to communicate why some of their colleagues are being let go and what their new roles are/ who will handle the transition for them |
| Capital H Group investors (FT Ventures) | At the same time as general announce-ment | Phone call or email | Dan | No | Need to communicate that we remain very upbeat about our acquisition strategy |
| Capital H Group Employees | ASAP | MDs in small meetings and | First communications should come from MD; Dan to address again in a future All-employee call or other mechanism TBD | No | Need to communicate that we remain very upbeat about our acquisition strategy |
| Capital H Group CRMs with pending opportunities | ASAP | Phone call | Sherry & Anita | To let them know any prospects will be handled on a case-by-case basis | |
| PeopleMatter Clients - Legacy (ACS, Vail, etc.) - New (CCC, Bowe, Skillsoft) -Prospects (Sencorp) | Postpone until a case-by-case assessment is completed and strategic direction | Phone call | Anita with CRM / MD | TBD | |
| PeopleMatter Clients' Accounts Receivable | postpone | No communication necessary???? | Derek | No | |
| Media | | No proactive communications but we need to be prepared to respond | Media calls, if any, need to be directed to Heidi. | No | |
| PeopleMatter Website | postpone | | Heidi to handle | No | |
| Capital H Group Website | postpone | | Heidi to handle | No | |