**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PM, INC., an Alaska Corporation,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **08 C 4935** |
| **CAPITAL H GROUP, LLC a Delaware limited liability** | ) | **Judge Robert M. Dow, Jr.** |
| **company, Defendant** | ) | |

### CAPITAL H GROUP, LLC'S ANSWER TO CORRECTED COMPLAINT

Defendant, Capital H Group, LLC ("Capital H Group"), by and through its attorneys,

hereby answers Plaintiff's Corrected Complaint as follows.

### JURISDICTION

### Paragraph No. 1

There is federal jurisdiction over the matter and the parties hereto as the Plaintiff and the Defendant are corporations existing under the laws of different states.  The Defendant has an office in Illinois, the Plaintiff has no office in Illinois.  The amount in question exceeds seventy-five thousand dollars ($75,000) the jurisdictional threshold for federal court jurisdiction.

### Answer No. 1

Capital H Group admits that the United States District Court has jurisdiction premised

upon diversity of citizenship under 28 U.S.C. §1332.

### VENUE

### Paragraph No. 2

Venue is properly in the Northern District of Illinois as the contract between the parties which has given rise to this complaint sets Chicago, Illinois as the venue for any disputes between the Parties related to that contract.

### Answer No. 2

Capital H Group admits that venue is proper in this federal judicial district under 28

U.S.C. § 1391(a).

## COUNT I
### (Breach Of Contract)

### Paragraph No. 3

PM, Inc. is an Alaska corporation with its principal place of business in Anchorage, Alaska.  It is currently out of business.  Its name was changed from PeopleMatter, Inc to PM, Inc shortly after its assets were purchased by Capital H Group as hereinafter more fully described.

### Answer No. 3

Capital H Group lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 3, and therefore denies them.

### Paragraph No. 4

When in business, PM produced and sold "enterprise software" and related services to human resource departments of various large business which permitted those users to efficiently track, compare, quantify and review the performance of its employees and leadership.  Its software was used by some of the largest and most successful companies in the United States, such as Vail Properties, Abbott Laboratories, BP, Alaska Airlines, Skillsoft, Kleinfelder, CCC Information Services, ACS, Bowe Bell & Howell, and had pending proposals at firms such as Boeing, Sencorp, Costco, etc.  The word "enterprise", in this context, is a proper name for the software.

### Answer No. 4

Capital H Group lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 4, and therefore denies them.

### Paragraph No. 5

Capital H Group, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  It is in the business of selling services to human resource departments of large businesses and in some regards its business and target market for its products is similar to that of PM when it was in business.  The most significant difference between them was that PM provided software and Capital H did not create software for the human resources industry.  However, the end users of the goods and services produced by both companies were the same.  In fact, PM and Capital H competed for the same customers.

### Answer No. 5

Capital H Group admits that it is a Delaware limited liability company with its principal place of business in Chicago, Illinois.   Capital H Group denies the remaining allegations in Paragraph 5.

### Paragraph No. 6

> PeopleMatter, Inc. was founded in 1999 in Alaska and became successful due to the diligence, creativity and technological focus of its founders. PeopleMatter, when competing for customers against older, larger, more established and better funded competitors in the same field, was frequently successful.

### Answer No. 6

Capital H Group lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and therefore denies them.

### Paragraph No. 7

> When PeopleMatter, Inc was founded few other companies in the human resources business had created software that was user friendly, internet based and had the ability to scale quickly and address the full lifecycle of the human resource segment of the workplace.

### Answer No. 7

Capital H Group lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and therefore denies them.

### Paragraph No. 8

> Capital H is a large and well-financed service provider in the human resources administration industry.   It is successful because of its expertise in sales and marketing.   Capital H's strength is as a sales organization and not as a developer of software.   It sells products and services designed, created and manufactured by others.

### Answer No. 8

Capital H Group denies Plaintiff's characterization of Capital H Group, and therefore denies the allegations in Paragraph 8.

### Paragraph No. 9

PeopleMatter, Inc. was founded in 1999 by Anita and David Laurence, both of whom live in Anchorage, Alaska and have held important positions in large organizations. David Laurence's expertise is primarily in engineering and general management. Anita Laurence's expertise is in administration, marketing and product design.

### Answer No. 9

Capital H Group lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 9, and therefore denies them.

### Paragraph No. 10

All or most of the acts complained of herein occurred in the County of Cook, State of Illinois and the parties have agreed that the venue for any disputes between them is to be Cook County, Illinois.

### Answer No. 10

Capital H Group admits that venue is proper in Cook County, Illinois. To the extent that

Paragraph 10 contains factual allegations beyond the foregoing, Capital H Group denies them.

### Paragraph No. 11

In 2003, a customer of PeopleMatter introduced David and Anita Laurence to an officer of Capital H. Dan Weinfurter CEO. At that time, PeopleMatter correctly perceived the strength of its software product in the marketplace, but knew that in order to get the product before the most senior officers of companies which were potential users it needed the sales and marketing ability it did not then have. Capital H told Anita and David Laurence that it had a very strong marketing and sales force. The original conversations between the executives of the two companies were to determine if there was a way that the respective independent companies could work together, somewhat like a joint venture, to take advantage of the software developed by PeopleMatter and the sales ability of Capital H.

### Answer No. 11

Capital H Group denies the allegations in Paragraph 11.

### Paragraph No. 12

After a number of meetings between principals, Capital H proposed to PeopleMatter for the first time a new proposition that the Parties had not

4

previously discussed:  that Capital H would acquire PeopleMatter and/or its assets and that the senior executives of PeopleMatter would become employees of Capital H and continue to develop its products and sell its services as a separate department of Capital H.  After lengthy consideration, PeopleMatter agreed in principal to a sale of its business and assets to Capital H.  After a prolonged due diligence period, discussion, negotiations and interviews, Capital H purchased the assets of PeopleMatter on September 1, 2006.  The purchase terms are set forth in the Asset Purchase Agreement dated, Sept, 2006 and attached hereto as Exhibit 1.

### Answer No. 12

The allegations in Paragraph 12 constitute a legal conclusion to which no answer is required. To the extent that Paragraph 12 of the Corrected Complaint contains any factual allegations, Capital H Group denies them.

### Paragraph No. 13

The consideration Capital H was to pay for the PeopleMatter's assets and business was divided into three parts: a) PeopleMatter received a modest down payment called the Base Purchase Price of $200,000 and, b) it was to receive an "Earn-Out" over a four year "Earn-Out" period equal to the profits of PeopleMatter standing alone and separate from the other business of Capital H and, c) the executives of PeopleMatter were to receive a bonus if profits met a certain level.  See Exhibit 1, Sections 3.3 and 3.4.  The principals of PeopleMatter were requested to sign employment agreements that, in effect, restricted their ability to compete against Capital H in the future if they left its employ, lowered their compensation and limited their guaranteed employment period to thirty days.

### Answer No. 13

The allegations in Paragraph 13 constitute a legal conclusion to which no answer is required. To the extent that Paragraph 13 of the Corrected Complaint contains any factual allegations, Capital H Group denies them.

### Paragraph No. 14

By far the largest component of the purchase price was the "Earn-Out" component which would have paid to PM, Inc, the new name for PeopleMatter, Inc., the profits of the next four years of operation.  The "target" of that Earn-Out amount, an amount chosen by Capital H, and agreed to by the Plaintiff, was eight million, seven hundred thousand dollars ($8,700,000).  More money could be earned if profits were higher.

### Answer No. 14

Capital H Group denies that any Earn-Out amount was assured or promised to Plaintiff.

Capital H Group denies the remaining allegations in Paragraph 14.

### Paragraph No. 15

The $200,000 base payment was paid.  No portion of the "Earn-Out" or executive bonus were ever paid.

### Answer No. 15

Capital H Group admits that it paid $200,000 for the purchase price of Plaintiff's assets

and that no Earn-Out payments were ever paid or owing to Plaintiff.

### Paragraph No. 16

The business and financial payment plan, fully described in the Asset Purchase Agreement, was to have PeopleMatter or the business that once belonged to PeopleMatter run as a separate business under the direction of the Laurences and their senior management and to account for its profits separately from those of the remainder of Capital H.  Then, annually, the profits of PeopleMatter would be calculated and a notice of such calculation would be sent to the Laurences and the "Earn-Out" paid.  See Exhibit 1, Sections 3.3 (a) through (g).

### Answer No. 16

Paragraph 16 constitutes a legal conclusion to which no answer is required.  To the extent

Paragraph 16 of the Corrected Complaint contains any factual allegations, Capital H Group

denies them.

### Paragraph No. 17

The business of PeopleMatter, after the sale of its assets to Capital H, had to be managed and sales generated in order to produce profits and to make the "Earn-Out" payments for PeopleMatter.  All PeopleMatter, now PM, sales personnel reported to Capital H management.

### Answer No. 17

Capital H Group admits that sales and profits had to be generated in order to make earn-

Out payments.  Capital H Groups denies the remaining factual allegations in Paragraph 17.

### Paragraph No. 18

Prior to the execution of the Exhibit 1, the Asset Purchase Agreement, David Laurence was requested by Capital H to prepare a four year hiring plan, which he did. The Plan was completed and approved by Capital H. That Plan required PeopleMatter to hire twenty-six (26) people in the first year and have ninety or more full time employees by the fourth year as business under Capital H's ownership. Shortly after the Purchase Agreement was entered into, David and Anita Laurence were directed to begin the hiring process and they did. A substantial portion of the Laurences' efforts in the initial months after the acquisition was spent hiring new people. These new hires started work between September and December 2006.

### Answer No. 18

Capital H Groups lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and therefore denies them.

### Paragraph No. 19

Again, in January of 2007, Anita and David Laurence were instructed by Capital H to hire an additional six people (bringing the total to 18) to develop and support the PeopleMatter products, which they did.

### Answer No. 19

Capital H Group denies the allegations in Paragraph 19.

### Paragraph No. 20

From September, 2006 to March, 2007, the former executives of PeopleMatter trained the sales force of Capital H on the PeopleMatter software products.

### Answer No. 20

Capital H Group lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore denies them.

### Paragraph No. 21

In March of 2007, the Capital H CEO, Dan Weinfurter, directed David and Anita Laurence to fire all of their employees and shut down operations. They reluctantly followed that direction. No reason was given for the termination of the business other than as found in the email directing the termination of the business. It is attached hereto as Exhibit 2.

## Answer No. 21

Capital H Group denies the allegations in Paragraph 21.

## Paragraph No. 22

PM promptly fired almost all of their employees.  A few stayed on to handle servicing of existing PM customers to whom PM had an obligation to support its software.  Anita Laurence and one or two employees stayed on until July of that year.  In April or 2007, but a few weeks after Capital H closed the PeopleMatter business and the terminated its employees, David Laurence had a severe traumatic brain injury which put him in the hospital for months and eventually led him to rehabilitation, which he still attends.

## Answer No. 22

Capital H Group lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 22, and therefore denies them.

## Paragraph No. 23

In the six short months that Capital H owned the assets of PeopleMatter, it had fired all of its personnel and lost all of its customers.

## Answer No. 23

Capital H Group denies the allegations in Paragraph 23.

## Paragraph No. 24

By the end of March 2007 PeopleMatter, almost all of its employees, its customers and its assets were all gone.  PeopleMatter was for all practical reasons "dead" and any opportunity to earn the eight million, seven hundred thousand dollar "target" "Earn-Out" was dead with it.  If PeopleMatter achieved greater profits than the target it could have earned even more during the four year "Earn-Out" phase.

## Answer No. 24

Capital H Group lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 22, and therefore denies them.

## Paragraph No. 25

Notwithstanding Capital H's termination of the PeopleMatter business and the firing of its employees, it held David Laurence, who spent months in the

hospital, Anita Laurence and others to their employment agreements with Capital H and thusly restricted their ability to find new jobs.

## Answer No. 25

Capital H Group denies the allegations in Paragraph 25.

## Paragraph No. 26

After Capital H closed PeopleMatter and fired its employees, David and Anita Laurence offered to purchase PeopleMatter back from Capital H so that their many years of hard work and huge investment in time and money would not be lost. Their request was refused as Capital H demanded a price that was so high it was economically impossible to reacquire the PeopleMatter assets that were sold.

## Answer No. 26

Paragraph 26 constitutes a legal conclusion to which no answer is required. To the extent

Paragraph 26 of the Corrected Complaint contains any factual allegations, Capital H Group

denies them.

## Paragraph No. 27

The Defendant's termination of all of the employees of PeopleMatter and closing of the business was a breach of the Asset Purchase Agreement.

## Answer No. 27

Paragraph 27 constitutes a legal conclusion to which no answer is required. To the extent

Paragraph 27 of the Corrected Complaint contains any factual allegations, Capital H Group

denies them.

## Paragraph No. 28

The Asset Purchase Agreement states:

Section 3.5 Post Closing Operations. During the Earn-Out Period:

(a)     The Buyer shall operate the PeopleMatter Division as a stand alone division of the Buyer, and such division shall serve as the Buyer's national enterprise talent management systems platform.

(b)     The PeopleMatter Division will be a stand alone P & L including separate business and financial plans (all presented on a GAAP accrual basis).

(c)     The PeopleMatter Division will be charged a fixed annual share of the Shared Services and Corporate Expenses based on four percent (4%) of the PeopleMatter Division's annual total costs.

(d)     PeopleMatter Division will be charged the standard Commissions payable to the Buyers Client Relationship Managers on all revenues generated by the PeopleMatter Division.

### Answer No. 28

Capital H Group denies the allegations in Paragraph 28 to the extent that the quoted section is incomplete and is therefore misleading.

### Paragraph No. 29

The Asset Purchase Agreement clearly divided the time after the acquisition of the PeopleMatter assets into two parts: one part was the "Earn-Out Period" and the other was what remained.

### Answer No. 29

Paragraph 29 constitutes a legal conclusion to which no answer is required.

### Paragraph No. 30

The Asset Purchase Agreement requires in Section 3.5 thereof, that for the four year period of time, the "Earn-Out Period", that the PeopleMatter Division be active and in business.

### Answer No. 30

Paragraph 30 constitutes a legal conclusion to which no answer is required.  To the extent Paragraph 30 of the Corrected Complaint contains any factual allegations, Defendant denies them.

### Paragraph No. 31

The closing of the PeopleMatter Division by Capital H deprives PM, Inc. of the opportunity to earn during the "Earn-Out" Period the Earn-Out amount, targeted at eight million, seven hundred thousand dollars ($8,700,000).  PM, Inc

could earn more than the Earn-Out target amount if the profits exceeded the eight million, seven hundred thousand dollar amount.

### Answer No. 31

Paragraph 31 constitutes a legal conclusion to which no answer is required. To the extent Paragraph 31 of the Corrected Complaint contains any factual allegations, Capital H Group denies them.

### Paragraph No. 32

Since March, 2007 Capital H has not sold a PeopleMatter product and the PeopleMatter Division has not operated. Without sales of its products, PeopleMatter cannot achieve any Earn-Out payments and hence it is deprived of the benefit of its bargain with Capital H. With most of the money for its sale of its business assets coming from the "Earn-Out", a cessation of PeopleMatter's business prevents it from receiving any funds it was promised for its assets, customers and business opportunities.

### Answer No. 32

Paragraph 32 constitutes a legal conclusion to which no answer is required. To the extent Paragraph 32 of the Corrected Complaint contains any factual allegations, Capital H Group denies them.

### COUNT II
### (Breach Of Implied Warranty Of Good Faith And Fair Dealing)

### Paragraph No. 33

The allegations contained in Paragraphs 1-32 of Count I are incorporated herein.

### Answer No. 34

Capital H Group re-alleges and incorporates its responses as is fully set forth herein in the answers of Paragraph 1-32 above.

### Paragraph No. 34

In the transaction to sell the assets of PeopleMatter and dealings with Capital H, the Defendant, Capital H had made an implied warranty of good faith and fair dealing which, in instant sale, requires that Capital H not terminate the

business of PeopleMatter and deprive PM, Inc of its bargained for opportunity to get paid for the sale of its assets to Capital H.

### Answer No. 34

In its minute order dated October 29, 2008, the Court ruled that it will dismiss Count II of this Complaint.

### Paragraph No. 35

Defendant Capital H breached its implied warranty of good faith and fair dealing by shutting down the business of PeopleMatter, and firing the employees and abandoning the customers of PeopleMatter to whom it owed various ongoing obligations, including support for the PeopleMatter software.

### Answer No. 32

In its minute order dated October 29, 2008, the Court ruled that it will dismiss Count II of this Complaint.

### Paragraph No. 36

Capital H knew or should have known that the Agreement it drafted for the purchase of PeopleMatter's assets required it to keep the PeopleMatter Division open and doing business so that PM could be paid the Earn-Out consideration for the sale of its assets, customers and opportunity.

### Answer No. 36

In its minute order dated October 29, 2008, the Court ruled that it will dismiss Count II of this Complaint.

### Paragraph No. 37

Capital H intentionally and without regard to PM, Inc ignored its warranty of good faith and fair dealing to PM, Inc when it fired all of the employees of the PeopleMatter Division, shut the business down and abandoned the customers of PeopleMatter. Attached as Exhibit 2 hereto is the memo prepared by the Defendant and sent to People Matter terminating the business.

### Answer No. 37

In its minute order dated October 29, 2008, the Court ruled that it will dismiss Count II of this Complaint.

### Paragraph No. 38

Capital H's breach of its implied warranties of good faith and fair dealing damaged PM, Inc in the amount of eight million, seven hundred thousand dollars ($8,700,000), the targeted Earn-Out amount or such other amount as the evidence may prove.

### Answer No. 38

In its minute order dated October 29, 2008, the Court ruled that it will dismiss Count II of this Complaint.

### AFFIRMATIVE DEFENSES

Capital H Group pleads its affirmative defenses without prejudice to its Answer to Complaint as follows.  In so doing, Capital H Group does not admit any of the allegations in the Complaint and does not concede that Plaintiff has properly stated any cause of action.

### Affirmative Defense No. 1

### (No Right to Jury Trial)

1.      PM, Inc. is estopped from and has waived its right to demand a jury trial. Pursuant to the parties' Asset Purchase Agreement, each party irrevocably waived any and all rights to a trial by jury.

### Affirmative Defense No. 2
### (Failure to State a Claim)

2.      The Complaint fails to state a claim against Capital H Group upon which relief can be granted.

### Affirmative Defense No. 3
### (Failure to Mitigate Damages)

3.      Plaintiff has failed to take reasonable, necessary, appropriate, and feasible actions to mitigate its alleged damages and is therefore barred from recovering any of its alleged damages to the extent attributable to its failure to mitigate.

**Affirmative Defense No. 4**
**(Impossibility)**

4.      Without admitting failure to perform under the contract, any failure to perform by Capital H Group is excused by impossibility.   In Illinois, performance is excused if an unanticipated occurrence renders performance of the contract vitally different from what was reasonably contemplated when the contract was executed.  Pursuant to the parties' agreement, the contract is governed by the laws of Illinois.

**Affirmative Defense No. 5**
**(Commercial Frustration)**

5.      Without admitting failure to perform under the contract, any failure to perform by Capital H Group is excused by commercial frustration.  In Illinois, performance is excused when a sudden change in condition renders performance impossible and the object of the contract frustrated.  Pursuant to the parties' agreement, the contract is governed by the laws of Illinois.

**Affirmative Defense No. 6**
**(Estoppel)**

6.      Without admitting failure to perform under the contract, PM, Inc. is estopped from asserting claims against Capital H Group because Capital H Group relied to its detriment on representations made by PM, Inc.  Capital H Group had no knowledge or convenient means of knowing PM, Inc.'s representations were false.

**Affirmative Defense No. 7**
**(Breach of Contract)**

7.      Without admitting failure to perform under the contract, any failure to perform by Capital H Group is excused by PM, Inc.'s breach of contract.  In Illinois, nonperformance by the non-breaching party is excused when the other party materially breaches the contract.  Pursuant to the parties' agreement, the contract is governed by the laws of Illinois.

## RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES

Capital H Group reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure and any other defenses, at law or at equity, that may exist now or in the future based upon discovery and further factual investigation in this case.

Dated: December 23, 2008

By: /s Alexander Vesselinovitch
One of the Attorneys for Capital H Group, LLC

Alexander S. Vesselinovitch
Kathy L. Kottos
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661
312-902-5200

50511939v2